Keith Beauchamp (012434)
John C. Kelly (012770)
Vidula U. Patki (030742)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1200
Phoenix, Arizona  85004
T:  (602) 381-5490
F:  (602) 224-6020
kbeauchamp@cblawyers.com
jkelly@cblawyers.com
vpatki@cblawyers.com

*Attorneys for Defendant Sonora Quest Laboratories, LLC*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Shawna Shields, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Sonora Quest Laboratories, LLC; and RSI Enterprises, Inc.,<br><br>Defendants. | No. CV-15-00723-PHX-SPL<br><br>**MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Shawna Shields seeks statutory damages for eight phone calls that she received in connection with services provided to her by Sonora Quest Laboratories, LLC ("SQL") on July 2, 2013.  The calls were made by SQL's debt collection agency, RSI Enterprises, Inc. ("RSI"), because Plaintiff did not pay for the services SQL provided.  Plaintiff contends that those calls violated the Telephone Consumer Protection Act ("TCPA").

The purpose of the TCPA is to curb unsolicited telemarketing calls.  Where, as here, the Plaintiff gives her phone number to an entity providing services, she has consented to be called at that number in connection with those services, so the statute is

{00255780.1 }

not violated. *See* 47 U.S.C. § 227(b)(1)(A)(iii) (permitting calls "made with the prior express consent of the called party").

In this case, Plaintiff provided her phone number—and thus gave express consent—on multiple occasions, any one of which was sufficient to permit SQL or RSI to call regarding her failure to pay for the services that SQL had provided. First, Plaintiff provided her phone number verbally to SQL on her July 2, 2013 visit to SQL's laboratory at Arizona Family Care ("AFC"). Second, Plaintiff provided her phone number to AFC, the physician practice that ordered her blood work at SQL, with the understanding that AFC would provide that phone number to others (like SQL). In fact, she signed an authorization form specifically permitting AFC to release her information to specialist offices like SQL for the purpose of administering claims. Moreover, AFC's Notice of Privacy Practices ("NPP"), a copy of which Plaintiff acknowledges receiving, permitted AFC to share her information with other business associates and providers, including specialists like SQL. Plaintiff also received services from SQL at another physician practice (Focus on Women ("FOW")), where she similarly permitted her phone number to be shared with SQL. Third, she provided her phone number directly to RSI, and instructed RSI to use that number to contact her.

Binding case law, as well as guidance from the Federal Communications Commission ("FCC"), establish that Plaintiff's act of providing her phone number in these circumstances constitutes prior express consent under the TCPA. Thus, summary judgment should be entered for SQL on Plaintiff's complaint.[1]

This motion is supported by the Statement of Facts filed herewith, as well as the entire record in this case.

---

[1] Also pending before this Court is Plaintiff's motion for class certification. [Dkt. 71] Defendants SQL and RSI filed a joint Response to that motion on June 20, 2016 [Dkt. 94], asserting that class certification was improper for a variety of reasons. This Motion addresses only Plaintiff's individual claim against SQL. However, the arguments and factual circumstances addressed here illustrate why class certification is inappropriate, given the individualized nature of these issues.

## I. BACKGROUND

### A. Shawna Shields' July 2013 Visit to SQL.

On June 30, 2013, Plaintiff visited AFC—a physician practice group—for the first time. [SOF 1] While there, Plaintiff completed and signed the AFC Patient Information form, providing her cell phone number and other demographic information. [SOF 1] The AFC Patient Information form explained that AFC could release the information provided by Plaintiff to any "specialist office" for not only purposes of medical treatment, but also for administering claims. [SOF 2] Plaintiff also received a copy of AFC's NPP, which advised that AFC may "provide information to health care providers outside of our practice who are providing you care" and to business associates "who perform health care operations for us." [SOF 4]

At her first AFC visit, Plaintiff was directed to have her blood drawn by the SQL IOP on site at AFC. [SOF 5] Because Plaintiff had not fasted in advance of her June 30 visit as required for the blood draw, Plaintiff did not have a blood drawn that day. Instead, she returned two days later - on July 2, 2013 – for purposes of having testing performed by SQL. [SOF 6] On July 2, 2013, the SQL laboratory at AFC was manned by Lilly Islas, an SQL in-office phlebotomist ("IOP") who, at that point, had provided phlebotomy services for SQL at AFC for four years. [SOF 7]

Plaintiff signed SQL's sign-in sheet and waited for Ms. Islas in the AFC waiting room. [SOF 8] Plaintiff subsequently met with Ms. Islas and handed her the requisition form provided by AFC, which specified the tests to be performed by SQL. [SOF 9] The only demographic information included on the AFC requisition form was Plaintiff's name and date of birth. [*Id.*] AFC did not provide Plaintiff's number to SQL on the requisition form. [SOF 10]

Consistent with SQL's Procedure Manual for its Patient Service Centers and IOPs ("SOPs"), Ms. Islas verbally confirmed with Plaintiff the accuracy of Plaintiff's first and last name and date of birth from the AFC requisition form. [SOF 11 & 12]

1   Using the information provided on the requisition form, Ms. Islas accessed SQL's
2   Care360 Laboratory Orders and Results ("Care360") system to see if Plaintiff had an
3   existing record in that system. [SOF 13] The Care360 system is an electronic health
4   record system. [SOF 14] It is an independent, stand-alone database where patient
5   information can only be entered into the system by an SQL phlebotomist, or a physician's
6   office that has enrolled in the system. [*Id.*] If the Care360 system indicates that the
7   patient has an existing record based on her name and date of birth, the SQL phlebotomist
8   can open the record and view the patient's demographic information. [SOF 15]

9   When Ms. Islas accessed the Care360 system that day, however, she inadvertently
10  entered the wrong birthdate for Plaintiff (6/19/72 instead of 6/18/72) and was unable to
11  find an existing record for Plaintiff. [SOF 16] Ms. Islas therefore created a new record
12  for Plaintiff where she manually populated Plaintiff's telephone number, address and
13  insurance information – as verbally provided by Plaintiff. [SOF 17] After reviewing the
14  information with Plaintiff, Ms. Islas discovered her data-entry error regarding Plaintiff's
15  birthdate and entered the correct birthdate in the Care360 system. [SOF 20]

16  The Care360 system then showed that Plaintiff had an existing record because of
17  lab tests processed in 2009 and 2010 by an SQL IOP that worked at a practice called
18  Focus on Women ("FOW"), where Plaintiff was previously a patient. [SOF 21] At
19  FOW, Plaintiff had been given a copy of FOW's NPP, which explained that her
20  information would be shared with other "specialists" for payment and other purposes.
21  [SOF 23] It also provided that "FOW will share health information about you with our . .
22  . other business associates." [*Id.*]

23  Ms. Islas orally verified with Plaintiff the demographic information contained in
24  that existing Care 360 record (including Plaintiff's cell phone number). [SOF 25] The
25  Care360 system generated an automatic note on Plaintiff's record that specified that "an
26  update or correction has been made to DOB." [*Id.*] Plaintiff then signed the second
27  requisition form, verifying the accuracy of her phone number as well as other information
28  on that form. [SOF 26]

{00255780.1 }                                    4

During Plaintiff's blood draw, SQL's NPP was displayed on the laboratory walls and take-home copies were available. [SOF 8] SQL's NPP advises that a patient's personal information can used by SQL for "payment" purposes, and that SQL could disclose that information to its business associates, including "outside collection agenc[ies]," for "billing and payment" purposes. [SOF 29]

**B.     RSI's Contacts with Plaintiff.**

SQL contracted with RSI to assist in debt collection during the period relevant to Plaintiff's claim. [SOF 30] In collecting on fees owed to SQL, RSI classifies debt as "bad debt" if the debt is not satisfied within three to four months. [SOF 30] RSI then initiates collection of this "bad debt" by sending the debtor at least one letter to the address provided by SQL. [SOF 33] If no response is received, RSI calls the debtor using the phone number provided by SQL.

As of the present litigation, Plaintiff had not timely paid SQL for six separate SQL service visits, including the July 2, 2013 visit. [SOF 31] RSI's interaction with Plaintiff on behalf of SQL predate that visit, however. In fact, RSI first called Plaintiff on July 28, 2010 and spoke to her about an unpaid bill for SQL services that were rendered on April 22, 2010. [SOF 36] During that call, Plaintiff agreed to make a $30.00 payment. [SOF 37] Plaintiff also "specifically asked that RSI call her back the next Friday at the number RSI had on file for her and at the number RSI had been calling to reach her about the debt."[2] [*Id.*] This number was 480-258-0635, the same number later called by RSI in connection with the July 2, 2013 visit. [*Id.*]

RSI ultimately called Plaintiff a total of nine times about the debt associated with the July 2, 2013 visit. [SOF 40] Eight of those attempts were made with an auto-dialer and one was by an RSI representative. [*Id.*] Plaintiff never revoked her consent to be

---

[2] On July 30, 2010, as requested by Plaintiff, RSI called the 480-258-0635 phone number and left a message. [SOF 38] Plaintiff then called RSI again on August 13, 2010 to make a partial payment and promised another forthcoming payment. [SOF 39]

called by RSI at the 480-258-0635 number, the same number she separately provided to SQL, FOW, AFC and RSI on various occasions.  [SOF 41]

## II.  LEGAL ARGUMENT

This Court must grant summary judgment if the pleadings and supporting documents viewed in the light most favorable to the non-moving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

### A.  Plaintiff Consented To Being Called When She Provided her Phone Number to SQL, FOW, AFC and RSI.

#### 1.  Express Consent May Be Given Directly Or Indirectly.

Plaintiff alleges that SQL and RSI violated the TCPA when RSI used an auto-dialer to call her cell phone number regarding debts she owed to SQL for the July 2, 2013 blood draw.  A violation of the TCPA occurs when (1) the defendant calls a cellular telephone number; (2) using an automatic telephone dialing system; (3) without the recipient's prior express consent.  *Meyer v. Portfolio Recovery Assocs. LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012).  Guidance from the FCC, the agency charged with interpreting and implementing the TCPA, recognizes that consent may be granted in any number of ways.  *Matter of GroupMe, Inc.*, 29 FCC Rcd. 3442, 3444 (2014) ("While the TCPA plainly requires a caller to obtain such consent, both the text of the TCPA and its legislative history are silent on the method, including by whom, that must be done."); *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, *Report and Order*, 30 FCC Rcd. 7961, 7990 (2015) ("[N]either the Commission's rules nor its orders require any specific method by which a caller must obtain such prior express consent").  The FCC's interpretation is guided by the policies and goals underlying the TCPA, which are not implicated when an individual is contacted about routine business matters, such as when a creditor contacts a debtor about the debt owed.  *Matter of GroupMe, Inc.*, 29 FCC

Rcd. at 3444 ("Congress did not expect the TCPA to be a barrier to normal, expected, and desired business communications.").

The classic example of prior express consent is when an individual provides her telephone number directly to another party without any limiting instructions. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, *Report and Order*, 7 FCC Rcd. 8752, 8769 (1992) ("*1992 Order*") ("[P]ersons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary."). By providing her telephone number, the individual "has in essence requested the contact by providing the caller with the telephone number for use in normal business communications." *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338, 342 (6th Cir. 2016) (citing *1992 Order* at 8769 n. 57). The FCC explicitly extended this general proposition to cell phone numbers in 2008. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, *Report and Order*, 23 FCC Rcd. 559, 599 (2008) ("*2008 Order*") ("[W]e clarify that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party.").

Additionally, an individual's prior express consent may be conveyed through an intermediary. *Matter of GroupMe*, 29 FCC Rcd. at 3446 (citing *2008 Order* at 564-65). The FCC has made "clear that consent to be called at a number in conjunction with a transaction extends to a wide range of calls 'regarding' that transaction, even in at least some cases where the calls were made by a third party." *Id.; see also Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) ("[W]e reject [Plaintiff's] argument that the 2008 FCC Ruling only applies when a cell phone number is given *directly* to the creditor . . . . [W]e see no sign that the FCC thought a cell phone number could be 'provided to the creditor' only through direct delivery."). Calls placed by a third-party debt collector on behalf of a creditor are accordingly treated as if the creditor placed the call. *2008 Order* at 565. The key to the prior express consent analysis,

1  therefore, is whether the called party authorized the contact regarding the transaction, not
2  who ultimately called the individual about the transaction. *Mais*, 768 F.3d at 1123.
3     The FCC's interpretation has been overwhelmingly adopted by the courts,
4  including the Ninth Circuit. *See, e.g., Baird v. Sabre, Inc.*, 636 Fed. App'x. 715 (9th Cir.
5  2016) (affirming grant of summary judgment because plaintiff's provision of phone
6  number when making airline reservation constituted express consent to receive text from
7  airline's vendor regarding flight).
8     Here, Plaintiff Shields indisputably consented to the calls that RSI made on SQL's
9  behalf by: (1) providing her cell number to SQL when her blood was drawn on July 2,
10 2013; (2) authorizing FOW, AFC and SQL to share her cell phone number with business
11 associates through their respective NPPs; and (3) contacting RSI about the debt she owed,
12 providing a number at which she could be reached, and requesting that RSI call her back
13 on her cell phone.

### 2.   Plaintiff Provided Her Number Directly To SQL.

15 Only one conclusion can be reached from the evidence relating to Plaintiff's visit
16 to SQL's office at AFC on July 2, 2013: Plaintiff orally provided her cell phone number
17 to SQL's IOP (Lilly Islas) and subsequently verified its accuracy with Ms. Ilsas before
18 her blood draw was performed. As a general practice, and pursuant to SQL policy,
19 SQL's IOPs collect demographic information (including a telephone number) directly
20 from a patient, or at least orally verify that information with the patient, prior to
21 performing any blood work. [SOF 11]  If a patient is new, and no prior record exists in
22 (or can be accessed from) SQL's Care360 system, the SQL IOP obtains the patient's
23 demographics directly from the patient and then enters that information (including the
24 patient's current phone number) into the system. [SOF 15]  If the patient is not new, and
25 a prior record exists and can be accessed, the SQL IOP still verifies the phone number
26 and other demographic information verbally with the patient before proceeding with the
27 collection of the specimen. [SOF 19 & 24]

Ironically, both of those situations occurred on Plaintiff's July 2, 2013 visit to the SQL laboratory at AFC. First, Plaintiff provided her telephone number directly to Ms. Islas because Ms. Islas could not access any existing Care360 record for Plaintiff (due to her inadvertent use of an incorrect birthdate for Plaintiff), and thus had to create a new record, with information that she obtained directly from Plaintiff. [SOF 16 & 17] The only place the phone number on that new record could have come from is from the Plaintiff. [SOF 27] Second, after Ms. Islas (and Plaintiff) discovered Ms. Islas' error and found an existing record for Plaintiff in the Care360 system, Ms. Islas (once again) orally verified Plaintiff's phone number (and other demographic information) directly with Plaintiff. [SOF 24-25] This comports with the SQL SOPs, which require that SQL's IOPs obtain updated contact information from each patient on each visit. [SOF 11] While Plaintiff has suggested, in her Complaint and elsewhere in this case, that SQL obtained Plaintiff's phone number from AFC, there is no evidence of that fact, and indeed, the evidence is just the opposite: Plaintiff's phone number was not on the manual requisition form that AFC completed and provided to SQL in connection with request for tests. [SOF 10]

It is undisputed that a patient's demographic information can only be entered into SQL's Care360 system by either an SQL phlebotomist or a physician's office (if that office is enrolled in the system and has been trained on data entry). [SOF 14] Here, AFC never accessed the Care360 System or input patient information into the system. [SOF 28] To the contrary: AFC always relied upon SQL's IOPs to enter patient demographic information into the system, and AFC never provided SQL with anything other than a manual requisition form (which, in this case, did not include Plaintiff's phone number [SOF 10]).

Jim Swanson, SQL's Customer Systems Manager, testified that no AFC personnel and no SQL IOP at AFC entered any information about Plaintiff into the Care360 system until July 2, 2013, when Lily Islas first created a new record for Plaintiff, and then printed a second, updated requisition form. [SOF 17] Plaintiff's unsupported assertion in

1  her class certification motion [Dkt. 71, p. 4: 2-3] that SQL obtained her cell phone
2  number from some third party, "industry-wide" database (which simply does not exist) is
3  plainly wrong.
4        Because Lily Islas could not have obtained Plaintiff's phone number from the
5  AFC requisition form, and because she did not access any pre-existing record in SQL's
6  Care360 database until after she created the first requisition form and inserted Plaintiff's
7  phone number, there is only one source from whom she could have obtained that number:
8  Plaintiff herself.
9        Providing a phone number directly is the quintessential example of prior express
10 consent for purposes of the TCPA. *2008 Order* at 564 ("We conclude that the provision
11 of a cell phone number to a creditor . . . reasonably evidences prior express consent by
12 the cell phone subscriber to be contacted at that number regarding the debt.").
13       Courts uniformly hold that summary judgment is appropriate on the facts
14 presented here. *See Baird v. Sabre, Inc.*, 636 Fed. App'x. 715 (9th Cir. 2016) (affirming
15 grant of summary judgment because plaintiff's provision of phone number when making
16 airline reservation constituted express consent to receive text from airline's vendor
17 regarding flight); *Baisden*, 813 F.3d at 346, (affirming grant of summary judgment
18 where plaintiff provided phone number to hospital at admission and was later called by
19 the debt collector for an anesthesiologist) ; *Mais*, 768 F.3d at 1123 (affirming grant of
20 summary judgment in suit against the debt collector for a radiologist where plaintiff
21 provided phone number on hospital admission form); *Murphy v. DCI Biologicals
22 Orlando, LLC,* 797 F.3d 1302 (11th Cir. 2015) (affirming grant of motion to dismiss
23 because plaintiff blood donor provided express consent to be contacted when he provided
24 phone number at intake); *Lawrence v. Bayview Loan Servicing, LLC*, 152 F. Supp.3d
25 1376 (S.D. Fla. 2016) (granting summary judgment because plaintiff expressly consented
26 to be called by loan servicer when he provided phone number on loan application and
27 correspondence); *Schwartz-Earp v. Advanced Call Center Tech., Inc.*, 2016 WL 899149,
28 15-CV-01582-MEJ (N.D. Cal. 2016) (granting summary judgment for debt collector

1  where plaintiff provided phone number in connection with credit card application);
2  *Daniel v. Five Stars Loyalty, Inc.*, 2015 WL 7454260, at *6 (N.D. Cal. Nov. 24, 2015)
3  (granting summary judgment because "an individual who knowingly provides her
4  telephone number to another party without limiting instructions has giving [sic] her prior
5  express consent to receive calls at that number from that party") (citing cases).

### 3. Plaintiff Authorized AFC and SQL to Share Her Cell Phone Number With Their Business Associates.

Even assuming, *arguendo*, that Plaintiff did not provide her phone number to SQL on July 2, 2013, and assuming that Plaintiff is correct in her assumption that SQL likely obtained that number from AFC, Plaintiff consented to AFC's release of her personal information to SQL and thus consented to SQL's (and RSI's) use of that information to contact her for payment of her bills.

Plaintiff has acknowledged that she provided her phone number to AFC. [SOF 1] Plaintiff has also acknowledged that she received AFC's NPP – an NPP advising that AFC would provide patient personal information to AFC's "business associates" and to "health care providers outside our practice who are providing you care." [SOF 4] SQL plainly fits those descriptions: it was both a business associate of AFC's and a health care provider involved in Plaintiff's care. As such, if (as Plaintiff alleges) AFC shared Plaintiff's phone number with SQL, AFC was authorized to do so.

When Plaintiff provided her cell phone number to AFC and authorized AFC to share that information with business associates such as SQL, Plaintiff provided prior express consent for SQL to contact her about the services that SQL performed for Plaintiff – which includes her payment for those services. As the *Baisden* court recognized, "consumers may give 'prior express consent' under the FCC's interpretation of the TCPA when they provide a cell phone number to one entity as part of a commercial transaction, which then provides the number to another related entity from which the consumer incurs a debt that is part and parcel of the reason they gave the number in the first place." 813 F.3d at 346.

The facts of *Baisden* are analogous to the AFC-SQL-RSI relationship here. In *Baisden*, the plaintiffs received medical care from a hospital that utilized the anesthesiology services of a private contractor. 813 F.3d at 340. The contractor billed the plaintiffs for services it provided at the hospital and eventually transferred the accounts to a debt collector, who called the plaintiffs' cell phone. *Id.*

The plaintiffs sued the contractor and the hospital, arguing that the anesthesiology provider and its collector had violated the TCPA because the plaintiffs had only consented to the hospital, not the anesthesiologist or its collection company, calling their cell phone. *Id.* at 344. The Sixth Circuit rejected that argument, concluding that it made no sense. *Id.* at 346. When they were admitted to the hospital, the plaintiffs authorized the hospital to release their health information for billing and payment purposes.[3] *Id.* at 340-41. The plaintiffs also received a copy of the hospital's NPP, which explained how their information would be shared with others.[4]

Relying on the FCC's prior orders and decisions that collectively permit prior express consent to be transmitted directly or through an intermediary, the Sixth Circuit concluded that "the provision of a cell phone number to a hospital that then provides that cell phone number to an affiliated physicians' group that provided medical services to a consumer arising out of the same occurrence can constitute 'prior express consent' under the TCPA" to be called by the debt collector for the physicians' group. *Id.* at 346. "[I]f one provides a cell phone number to a health organization seeking medical treatment, and a provider affiliated with that health organization treats that person for the same ailment, *it is normal, expected, and desired* to interpret that provision of the cell phone number as

---

[3] While the terms of the releases differed slightly for each of the two plaintiffs, and while the court analyzed the specific language of each release separately, both allowed for the release of information for "billing" purposes. 813 F.3d at 341.

[4] Again, while the terms of the specific NPPs differed slightly, they both authorized the release of health information to the hospital directory, family and "persons involved in my care." 813 F.3d at 341.

an invitation for an entity affiliated with that organization to call for something *arising out of* one's treatment." *Id.* at 345-46 (emphasis added).

Here, at the request of AFC (and Plaintiff), SQL performed a variety of laboratory tests for Plaintiff on July 2, 2013. Two days earlier, Plaintiff had signed a Patient Information form, specifically authorizing AFC to release her medical information "to any . . . specialist office . . . for purposes of medical treatment and evaluating and administering claims." [SOF 2] Additionally, Plaintiff had received a copy of AFC's NPP, which specified that AFC may "provide information to health care providers outside of our practice who are providing you care" and to business associates. [SOF 3 & 4]

When Plaintiff authorized AFC to share her contact information with SQL, it should have been "normal, expected and desired," as recognized by *Baisden*, for Plaintiff to be contacted by SQL (and by SQL's agents) regarding the work that SQL performed pursuant to AFC's request. 813 F.3d at 345-46. *Baisden* recognizes that it is permissible for SQL to have obtained intermediary consent through AFC, and further, that RSI's calls to Plaintiff (on behalf of SQL) are precisely the type of "routine" business matters that do not run afoul of the TCPA. *Id.*

The Eleventh Circuit reached the same conclusion on similar facts in *Mais,* 768 F.3d 1114. There, the plaintiff's wife provided her husband's demographic information to a hospital while in the emergency room and signed the hospital's NPP, authorizing the release of his personal information for billing and payment purposes. In that case, as here, when the plaintiff failed to pay for services provided by hospital-based provider, the provider forwarded his account to a debt collector that used automated technology to make collection calls. 768 F.3d at 1114.

The issue before the Court in *Mais* was whether the provider acquired express consent from the plaintiff such that the provider (or the debt collector) could use the plaintiff's telephone number to attempt to collect upon the debt. *Id.* More specifically, the court considered whether, "under FCC's interpretation of prior express consent, a

called party 'provides' his cell phone number to a creditor, when (during the transaction creating the debt) he authorizes an intermediary to disclose his number to the creditor for debt collection." *Id.* In affirming the grant of summary judgment for the defendant bill collector, the Eleventh Circuit held that when a patient receives a form stating "that the provided information will be used for payment and billing, the patient has the same reason to expect collection calls . . . ." *Id.* at 1122.

Here, Plaintiff was advised by AFC that her information could be shared with specialist offices and business associates (like SQL) and that it could be used for "administering claims." [SOF 2, 3 & 4] Moreover, SQL's NPP similarly advised that patient information could be shared by SQL with "collection agenc[ies]" for "billing and payment" purposes. [SOF 29] Thus, even crediting Plaintiff's unproved assertion that SQL received her phone number from AFC, she consented to be called by SQL (and its collection agency) when she gave her phone number to AFC with no limiting instruction.

### 4. Plaintiff Consented to RSI's Contact With Her By Both Calling RSI and Requesting that RSI Contact Her.

On July 28, 2010 Plaintiff requested that RSI call her at the number it had on file for her—the very same number that RSI called in 2013 giving rise to her claims in this case. Her request related to a debt owed to SQL. [SOF 36] Specifically, on July 28, 2010 RSI called Plaintiff and, during that call, she made a payment towards the debt owed to SQL. She also "specifically asked that RSI call her back again the next Friday." [SOF 37] As requested by Plaintiff, RSI subsequently called Plaintiff and left a message. [SOF 38] Plaintiff then called RSI back two weeks later to make a partial payment of $25.00 and promised a forthcoming payment. [SOF 37] Plaintiff never asked RSI not to call her and revoked her consent to be called at that number. [SOF 39 & 41]

Plaintiff's invitation to RSI to call her in connection with debts owed to SQL constitutes express consent. *See Baird v. Sabre*, 636 Fed. Appx. 715 (9th Cir. 2016) (affirming summary judgment where plaintiff consented to text messages from vendor of Hawaiian Airlines when she provided her cell number while making a flight reservation);

{00255780.1}                                    14

*Roberts v. Paypal, Inc.*, 621 Fed. Appx. 478 (9th Cir. 2015) (affirming that plaintiff gave express consent to PayPal when he added his cell number to his PayPal account). It makes no difference that RSI obtained Plaintiff's consent in 2010. *See Baisden,* 813 F.3d at 348 (rejecting plaintiff's claim that NPP authorized consent for only one year; the language of the authorization contained no such time period and so consent was valid until revoked through "reasonable means"); *Murphy v. DCI Biologicals Orlando, LLC,* 797 F.3d 1302 (11th Cir. 2015) (blood plasma donation center did not violate TCPA by contacting plaintiff after he had provided his cell phone numbery on a donor information Sheet). By directing RSI to call her in connection with debts being collected on behalf of SQL, and never revoking that consent, Plaintiff gave express consent to RSI's use of that number when collecting debt on behalf of SQL in 2013.

## III.   CONCLUSION

SQL respectfully requests that the Court grant summary judgment in favor of SQL and order Plaintiff to pay SQL's attorneys' fees and costs pursuant to A.R.S. 12-341.01.

Respectfully submitted this 11th day of October, 2016.

**COPPERSMITH BROCKELMAN PLC**

By  s/ Keith Beauchamp
    Keith Beauchamp
    John C. Kelly
    Vidula U. Patki

*Attorneys for Defendant Sonora Quest
  Laboratories, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

s/ Verna Colwell