IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Shawna Shields, on behalf of herself and all others similarly situated,

Plaintiff,

vs.

Sonora Quest Laboratories, LLC, et al.,

Defendants.

No. CV-15-00723-PHX-SPL

**ORDER**

Before the Court is Plaintiff's Motion for Class Certification (Doc. 71), and Defendants' motions for summary judgment (Docs. 120, 123.) For the reasons that follow, the motions for summary judgment will be granted and the motion for class certification will be denied.

**I. Background**

On April 21, 2015, Plaintiff Shawna Shields brought this action, on behalf of herself and all other similarly situated, against Defendants Sonora Quest Laboratories, LLC ("Sonora Quest") and RSI Enterprises, Inc. ("RSI") (collectively, "Defendants") for violating 47 U.S.C. § 227(b)(1)(A)(iii) of the Telephone Consumer Protection Act ("TCPA"). Plaintiff alleges that RSI, on behalf of Sonora Quest, improperly called her cell phone number using an automated system or artificial or prerecorded voice to make collection calls.

The factual background in this action is complicated by records from Plaintiff's previous providers and previous blood draws, but the information is necessary because

Plaintiff alleges that Sonora Quest obtained her phone number from one of those previous encounters. (Doc. 128 at 3.) Nevertheless, the motions for summary judgment are limited to the blood draw that occurred on July 2, 2013. (Doc. 1 ¶ 13.)[1] At issue is whether Plaintiff provided prior express consent to Sonora Quest to receive debt-collection calls to her cell phone regarding her blood draw on July 2. There are a limited number of ways that Sonora Quest could have obtained the information: (1) AFC provided Sonora Quest the information on or about July 2; (2) Sonora Quest obtained the information from Plaintiff directly on July 2; or (3) Sonora Quest obtained the information from its Care360 database which contains contact information from prior visits to Sonora Quest labs, including orders from other doctors.[2]

**A. Defendants' Standard Operating Procedures**[3]

Part of Sonora Quest's business model includes operating independent labs inside of doctors' offices. (Doc. 95 ¶¶ 2-3.) Lab procedures are performed by in-office phlebotomists ("IOP"). (Doc. 95 ¶ 2.) AFC provides "manual requisition forms," which are non-Sonora Quest forms that are filled out by hand by a doctor or staff member. (Docs. 124 ¶ 9; 125 ¶ 9.) These forms contain the patient's name, date of birth, and the requested lab tests, but do not contain any of the patient's demographic information, such as addresses or phone numbers. (Id.) After the IOP receives the manual requisition form, he or she checks Sonora Quest's Care360 system, a proprietary and "independent, stand-alone database," to see if a previous record for the patient exists. (Docs. 96 ¶ 4; 124 ¶ 13; 125 ¶ 13.) If a previous record exists, the IOP asks the patient to verify the information

---

[1] Plaintiff, or a family member for which Plaintiff was the responsible party, had five other visits to Sonora Quest that were also not paid and RSI was seeking to collect, but Plaintiff's Complaint does not mention those other dates. (Doc. 97 ¶ 13.)

[2] To the extent that there are other possible ways for Sonora Quest to receive information on a patient, they are not relevant to Plaintiff's encounters with Sonora Quest on July 2, 2013.

[3] The Court recounts Defendants' standard operating procedures as described by Defendants and attested to by declarations. Plaintiff disputes most of the procedures. Those disputes will be more thoroughly addressed in the Analysis section, *infra*.

contained in the record. (Doc. 95 ¶ 14.) If a previous record does not exist, the IOP must manually enter the information.[4] (Doc. 95 ¶ 15.) As the manual requisition form contains only the patient's name and date of birth, the IOP must obtain the address and phone number from the patient. (Id.) After creating a new requisition form, by either accessing a patient's previous record or creating a new record, the IOP prints the Care360 form and confirms the accuracy of the information with the patient. (Docs. 95 ¶ 18.)

When a patient does not pay his or her bill, Sonora Quest contracts with RSI to assist in debt-collection matters. (Docs. 124 ¶ 30; 125 ¶ 30.) Sonora Quest provides RSI with account information for the patient, including an address and telephone number. (Docs. 124 ¶ 33; 125 ¶ 33.) RSI then initiates its two-stage collection process, precollection and collection, which includes letters, automated phone calls, and calls made by live persons. (Docs. 121 ¶¶ 2-3; 126 ¶¶ 2a, 3d.) If the information provided by Sonora Quest proves to be inaccurate or out of date, RSI searches public databases. (Docs. 121 ¶ 1; 126 ¶ 1e.) However, that was not an issue here.

**B. Factual Background**

Some background on Plaintiff's previous healthcare provider, Focus on Women ("FOW") is necessary because FOW also utilized a Sonora Quest IOP who used the Care360 system. On March 30, 2009, Plaintiff acknowledged that she received FOW's privacy notice. (Doc. 94-1 at 45-52.) She also filled out the Patient Information form. (Doc. 102-1 at 77.) Plaintiff provided a phone number of -1255 and an address on Caminodeoro. (Doc. 102-1 at 77.) Her doctor ordered lab tests and a pap smear**.** (Doc. 102-1 at 76.) FOW handles lab tests and pap smears differently. Pap smears are not handled by the FOW IOP and do not get entered into the Care360 system. (Doc. 96 ¶ 21.) The manual requisition form for her lab work did not have Plaintiff's cell phone information on it. (Doc. 102-1 at 76.) The Care360 form for blood work did not contain

---

[4] The only people who can enter information into the Care360 system are phlebotomists and doctors' offices that have enrolled in the system. (Docs. 124 ¶ 14; 125 ¶ 14.) None of the doctors' offices involved here were enrolled since 2010. (Doc. 96 ¶¶ 18-19.)

Plaintiff's phone number. (Doc. 102-1 at 75.)

On April 22, 2010, both Plaintiff and a relative of Plaintiff sought treatment from FOW. Plaintiff filled out a Patient Information form for herself. (Doc. 102-1 at 83.) The form listed her house number as 8239 and she listed a phone number of -9547. (Id.) Her doctor ordered a pap smear (Doc. 102-1 at 82), which does not get entered into the Care360 system. Plaintiff also signed a form for her relative, listing the same address and Plaintiff's cell phone number of -0635. (Doc. 102-1 at 56.) The doctor ordered lab tests for the relative. (Doc. 102-1 at 55.) The manual requisition form contained the name and date of birth of the patient, but did not contain any contact information such as an address or phone number. (Id.) The Care360 form identified Plaintiff as the "Responsible Party" and listed a house number of 8239 and phone number of -0635. (Doc. 102-1 at 54.)

On June 17, 2010, an FOW practitioner ordered more lab tests for Plaintiff's relative. (Doc. 102-1 at 59.) As before, Plaintiff's name and address were not listed on the manual requisition form. (Id.) Plaintiff was again identified as the "Responsible Party," and her house number of 8239 and phone number of -0635 were listed on the Care360 form. (Doc. 102-1 at 57.) On April 26, 2011, a Care360 form identifies Plaintiff, a house number of 8239, and a phone number of -0635. (Doc. 102-1 at 87.) On October 19, 2011, the Care360 form identifies Plaintiff, lists an address on 68th Lane and contains the -0635 number. (Doc. 102-1 at 89.) On May 24, 2013, Plaintiff filled out a Patient Information form and listed her cell phone number. (Doc. 102-1 at 92.) As Plaintiff had recently moved, Plaintiff listed her new house number of 7920. (Id.) Her doctor ordered a pap smear (Doc. 102-1 at 91), which was not entered into the Care360 system and the FOW IOP was not involved. (Doc. 96 ¶ 21.)

On or around June 30, 2013, Plaintiff visited Arizona Family Care ("AFC") for the first time. (Docs. 124 ¶ 1; 125 ¶ 1.) She completed and signed AFC's Patient Information form, including her new address of 7920 and cell phone number of -0635. (Docs. 102-1 at 30; 124-1 at 9.) The Patient Information form explained that AFC could release the information provided by Plaintiff to any specialist office for not only purposes of medical

treatment, but also for administering claims. (Doc. 102-1 at 30.) She also signed a form that acknowledged receipt of AFC's Notice of Privacy Practice. (Doc. 94-1 at 65.) On June 30, her doctor directed Plaintiff to have her blood drawn by the Sonora Quest IOP. (Docs. 124 ¶ 5; 125 ¶ 5.) However, the blood draw required fasting and Plaintiff had not fasted on that day. (Docs. 124 ¶ 6; 125 ¶ 6.) Plaintiff returned on July 2, 2013 to have the blood draw performed. (Id.) Phlebotomist Lilly Islas was the regular Sonora Quest IOP for that location and she was there that day. (Docs. 124 ¶ 7; 125 ¶ 7.) Plaintiff handed Islas the manual requisition form provided by AFC, which identified the necessary tests to be performed. (Docs. 124 ¶ 9; 125 ¶ 9.) The form did not contain Plaintiff's cell phone number. (Docs. 124 ¶ 10; 125 ¶ 10.)

Islas verbally confirmed Plaintiff's name and date of birth from the AFC requisition form and asked Plaintiff for her insurance card. (Docs. 124 ¶ 12; 125 ¶ 12.) Using this information, Islas accessed the Care360 system to see if Plaintiff was already in the system. (Docs. 124 ¶ 13; 125 ¶ 13.) Islas, however, inadvertently entered the wrong birthdate for Plaintiff, and created a new record in the Care360 system rather than retrieving the existing record. (Docs. 124 ¶¶ 16-17; 125 ¶¶ 16-17.) This required Islas to manually populate Plaintiff's telephone number, address and insurance information as provided verbally by Plaintiff. (Docs. 124 ¶ 17; 125 ¶ 17.) Plaintiff testified at her deposition that Islas never verbally asked her for her address and telephone number. (Doc. 125-1 at 3.) After reviewing the information with Plaintiff, either Plaintiff or Islas discovered the mistake and Islas entered Plaintiff's correct birthdate into the Care360 system. (Docs. 124 ¶ 20; 125 ¶ 20.) The Care360 system automatically generated a notice that specified that "an update or correction has been made to DOB." (Docs. 125-3 at 3; 124 ¶ 25; 125 ¶ 25.) The Care360 system then showed Plaintiff's existing record from lab tests run from FOW from 2009 and 2010. (Docs. 124 ¶ 21; 125 ¶ 21.)

Islas printed out the final Care360 form and gave it to Plaintiff for review. (Docs. 102-1 at 61; 124 ¶ 25; 125 ¶ 25.) Plaintiff verified the accuracy of the information and signed the form. (Docs. 102-1 at 61; 124-1 at 9.) However, the parties dispute what

information Plaintiff verified. (Docs. 124 ¶ 25-26; 125 ¶ 25-26.) Plaintiff argues that she only verified that the samples were labelled in her presence. However, the form also states that she is verifying that "the information and spelling is accurate on sample(s) *and requisition*." (Doc. 125-3 at 3) (emphasis added). Ultimately, Plaintiff did not pay her bill and her account was referred to RSI for collection. (Doc. 97 ¶ 13.) RSI called Plaintiff on nine occasions regarding the July 2, 2013 bills, with eight of those calls being initiated by an automated system. (Doc. 124 ¶ 40.) Plaintiff then initiated this putative class action. (Doc. 1.)

## II. Standing

RSI raises the issue of standing. (Doc. 120 at 8.) Before the Court can reach the merits of this action, it must first determine whether Plaintiff has standing. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006); *Thomas v. Mundell*, 572 F.3d 756, 760 (9th Cir. 2009). RSI raises a colorable argument, but, after briefing closed in the instant case, the Ninth Circuit issued its opinion in *Van Patten v. Vertical Fitness Group, LLC*, --- F.3d ----, 2017 WL 460663, *4 (9th Cir. 2017). The Court "conclu[ded] that a violation of the TCPA is a concrete, *de facto* injury." *Id.* Although *Van Patten* addressed a different provision of the TCPA, 47 U.S.C. § 227(b)(1)(C) rather than 47 U.S.C. § 227(b)(1)(A), the Court's reasoning appears to apply to the TCPA as a whole. The Court found that "[t]he TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent." *Id.* Plaintiff makes the same claim here. As such, Plaintiff has standing.

## III. Motions for Summary Judgment

### A. Legal Standard

#### 1. Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

(1986). A fact is "material" when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact arises if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, and affidavits, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. The burden then shifts to the party opposing summary judgment, who "must make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of [her] case that [she] must prove at trial." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1153 (9th Cir. 2009) (citation omitted).

**2. TCPA**

Congress enacted the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq*. to address telemarketing calls and practices which Congress found to be an invasion of consumer privacy. The TCPA prohibits the use of automatic telephone dialing systems and artificial or prerecorded voices to cell phones unless the call is "made for emergency purposes or made with the prior express consent of the called party[.]" 47 U.S.C. § 227(b)(1)(A)(iii). A violation occurs when (1) the defendant calls a cellular telephone number; (2) using an automated telephone dialing system; (3) without the recipient's prior express consent. *Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036, 1043 (9th Cir. 2012). The third element is not part of the plaintiff's prima facie case, rather it is an affirmative defense because the burden is on the caller to prove consent. *Van Patten*, 2017 WL 460663 at *5.

Congress tasked the FCC with making the necessary rules and regulations to carry out the provisions of the TCPA. *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1117 (11th Cir. 2014). The Ninth Circuit accepts the FCC's interpretation of "prior

express consent." *Van Patten*, 2017 WL 460663 at *6.[5] District courts lack the jurisdiction to review FCC rulings. *Mais*, 768 F.3d at 1119-20.

In 1992, the FCC determined that "persons who knowingly release their phone numbers have in effect given their invitation or permission to be called at the number which they have given, absent instructions to the contrary." *In the matter of rules and regulations implementing the Telephone Consumer Protection Act of 1991*, 7 FCC Rcd. 8752, 8769 (1992) ("*1992 Order*"). In 2008, the FCC extended this general proposition to cell phones. *In the matter of rules and regulations implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 559 (2008) ("*2008 Order*") (the FCC determined "that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party").

"[P]rior express consent is a complete defense to [a] TCPA claim." *Van Patten*, 2017 WL 460663 at *5. The TCPA does not direct any specific method by which the caller must obtain consent. *In the matter of rules and regulations implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7990 (2015) ("*2015 Order*"). "Calls placed by a third party collector on behalf of that creditor are treated as if the creditor itself placed the call." *In the matter of GroupMe, Inc.*, 29 FCC Rcd. 3442, 3444 (2014) ("*GroupMe*"). "[C]onsent to be called at a number in conjunction with a transaction extends to a wide range of calls 'regarding' that transaction, even in at least some cases where the calls were made by a third party." *Id.* at 3446. "[A]n effective

---

5 To the extent Plaintiff relies on *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009), for the Ninth Circuit's definition of "express consent," the Court did not discuss or interpret the FCC's definition of "express consent." Rather, the Ninth Circuit relied on Black's Law Dictionary for its meaning. Earlier this year, the Ninth Circuit reviewed the FCC's definition of "express consent" and found it acceptable. This Court acknowledges that the implied consent as discussed in the FCC Rulings is a far cry from the traditional definition of express consent. However, this Court is bound by FCC Rulings. Until the FCC reverses its *1992 Order*, or a court of appeals invalidates it, this Court is required to follow it. *Reardon v. Uber Technologies, Inc.*, 115 F.Supp.3d 1090, 1097 (N.D. Cal. 2015) (collecting cases re: majority of courts holding "that a telephone customer who provides her number to another party consents to receive calls or texts from that party" "[i]n accordance with the 1992 FCC Order[.]").

consent is one that relates to the same subject matter as is covered by the challenged calls or text messages." *Van Patten*, 2017 WL 460663 at *6. Express consent does not mean that the consumer consented to all contacts for any purpose, but must "relate to the type of transaction that evoked it." *Id*.

**B. Express Consent in a Medical Setting**

The only element at issue here is the affirmative defense of express consent. It is undisputed that RSI called Plaintiff's cell phone using an automated system or artificial or prerecorded message to collect on an unpaid bill for services performed by Sonora Quest on July 2, 2013. If Plaintiff provided prior express consent, she has no claim. Defendants argue that they obtained Plaintiff's express consent, while Plaintiff "firmly denies" that she "spoke her name and address to the IOP." (Doc. 128 at 1.)

The Ninth Circuit has not directly addressed prior express consent in the context of a medical setting, but two of its sister circuits have addressed the issue. In *Mais*, a patient's wife provided his cell phone number when he was checked into the emergency room. 768 F.3d at 1110. The patient received radiology services from an independent contractor within the hospital. *Id.* at 1113. The radiology contractor forwarded the unpaid bill to a debt collection company, who used automated technology to contact the patient. *Id.* at 1114. The debt collector called between fifteen and thirty times and left four messages. *Id. Mais* argued, as here, that he did not provide express consent because the FCC's 2008 ruling did not apply to medical debt and because his wife provided the number to the hospital, not the radiology provider. The Eleventh Circuit rejected the plaintiff's allegation that the FCC did not include medical creditors, finding that "the FCC's general language sends a strong message that it meant to reach a wide range of creditors and collectors, including those pursuing medical debts." *Id.* at 1122 (citing *2008 Order* at 563). *Mais* argued that the ruling applied only to providing a cell phone number to a creditor on a credit application. *Id.* The Court quickly rejected that argument explaining that the FCC used the example "illustratively, not exclusively." *Id.* The Court reasoned that "[w]hen it comes to expectations for receiving calls, we see no evidence

that the FCC drew a meaningful distinction between retail purchasers who complete credit applications and medical patients who fill out admissions forms… A patient filling out a form from a healthcare provider may very well expect to be contacted about his health and treatment. But if the form explicitly states that the provided information will be used for payment and billing, the patient has the same reason to expect collection calls as a retail consumer." *Id.* The Court further rejected *Mais*'s claim that the *2008 Order* only applies when the phone number is given directly to the creditor. The Court's ruling was confirmed in *GroupMe*, where the FCC permitted consent be given through an intermediary. *GroupMe* at 3447. The Court found that, by providing his cell phone number to the hospital, the patient provided prior express consent to the radiology creditor. *Mais*, 768 F.3d at 1126.

The Sixth Circuit also directly addressed prior express consent in the context of medical debt. *Baisden v. Credit Adjustments, Inc.*, 813 F.3d 338 (6th Cir. 2016). The plaintiffs provided their cell phone numbers to the hospital where they received care. *Id.* at 340. They both received anesthesiology services while at the hospital. *Id.* The anesthesiology department, who are consultants, not employees of the hospital, turned the bills over to a debt collector after not receiving payment. The debt collector received the phone numbers from the anesthesiology consultants, who received the phone numbers from the hospital. *Id.* The patients signed Patient Consent and Authorization forms covering "all medical and surgical care." *Id.* The Sixth Circuit rejected plaintiffs' argument that they "needed to provide their cell phone numbers to their creditor,[] which they did not do." *Id.* at 344. The Court reasoned that "if one provides a cell phone number to a health organization seeking medical treatment, and a provider affiliated with that health organization treats that person for the same ailment, it is normal, expected, and desired to interpret that provision of the cell phone number as an invitation for an entity affiliated with that organization to call for something *arising out of* one's treatment." *Id.* at 345-46 (emphasis in original). The Sixth Circuit found "that consumers may give 'prior express consent' under the FCC's interpretation of the TCPA when they provide a

cell phone number to one entity as part of a commercial transaction, which then provides the number to another related entity from which the consumer incurs a debt that is part and parcel of the reason they gave the number in the first place." *Id.* at 346. Of note, the Sixth Circuit identified the medical care as a "commercial transaction," placing it firmly within the control of the FCC.

**1. Express Consent to AFC**

Turning to the facts here, it is undisputed that Plaintiff visited AFC for the first time on or around June 30, 2013. (Docs. 124 ¶ 1; 125 ¶ 1.) She completed and signed her doctor's Patient Information form, including her house number of 7920 and her cell phone number of -0635. (Docs. 102-1 at 30; 124-1 at 9.) The Patient Information form explained that AFC could release the information provided by Plaintiff to any specialist office "concerning advise, care, treatment, services … unless specifically excluded by me below, for purposes of medical treatment and evaluating and administering claims. (Doc. 102-1 at 30.)[6] AFC's Notice of Privacy Practices ("NPP") also may provide consent and Plaintiff acknowledges receiving a copy of AFC's NPP. (Docs. 94-1 at 32; 102-1 at 32, 65; 124-1 at 8-9.) Here, however, Defendants did not submit a valid NPP from AFC.[7]

While Plaintiff does not dispute that she gave her express consent to AFC, she disputes that AFC could provide Sonora Quest with her information despite the release she signed. (Doc. 128 at 7.) Plaintiff's argument that *Mais* and *Baisden* are distinguishable because they involved hospitals instead of a "family medical practice" is not persuasive. (Doc. 128 at 8.) She argues that the hospital patients received care from

---

[6] The signed form does not include any exclusions, and Plaintiff does not allege that she made any exclusions. (Id.)

[7] AFC's NPP is dated September 23, 2013, after the July 2, 2013 laboratory samples were obtained here. (Doc. 102-1 at 33-43.) Although Norma Anaya declares that she "understand[s] that [the NPP] was developed and adopted by APP in May of 2013, and thus was actually in effect as of July 2, 2013[,]" this is insufficient to overcome the deficiency. (Doc. 124-1 at 20.) The form would not have changed its effective date unless some piece of information in the form was updated. While the change could be immaterial to the facts here, there is not enough information to know what language was contained in the NPP in effect on July 2, 2013. Without more evidence, the NPP provided by AFC is inadmissible.

doctors practicing at the hospital. (Id.) Neither Circuit intended to limit their rulings to hospitals. The Sixth Circuit's ruling applied to patients seeking care from "health organizations" and "provider[s] affiliated with that health organization." *Baisden*, 813 F.3d at 345-46. Similarly, the Eleventh Circuit referred to a "patient filling out a form from a healthcare provider." *Mais*, 768 F.3d at 1122. Tellingly, neither the Ninth Circuit nor its sister circuits have disagreed with *Mais* or *Baisden*. Indeed, the Ninth Circuit cites to *Mais* approvingly on different grounds. *Van Patten*, 2017 WL 460663 at *6. Making *Mais* and *Baisden* even more relevant is that the healthcare providers operated within the hospital's space as contractors. Here, Sonora Quest also operated within Plaintiff's doctor's office as contractors. The primary factor for the circuit courts was whether the care was part of the same transaction, not whether the medical care being performed was in a hospital setting. Here, Plaintiff went to her doctor presumably for some type of symptoms. Her doctor determined that a blood test would help him determine how to treat Plaintiff's complaint. (Doc. 103 at 25.) The blood test required fasting, which Plaintiff had not done that day. (Docs. 124 ¶ 6; 125 ¶ 6.) She came back a couple of days later and got a blood test. (Id.) Plaintiff sought out Sonora Quest to perform the blood test; Sonora Quest did not go looking for Plaintiff. Plaintiff's blood work was clearly part of the same transaction and subject matter as her doctor appointment. *See Van Patten*, 2017 WL 460663 at *6.

Next, Plaintiff alleges that a phlebotomist is not a specialist, because a phlebotomist is not a doctor. (Doc. 128 at 8.) She claims, therefore, that she did not consent for her information to be sent to Sonora Quest. This Court disagrees. Laboratories are an integral part of the healthcare system. Healthcare today is delivered in many different formats by many different professionals. Nurses, nurse practitioners, physician's assistants, phlebotomists, x-ray technicians, and other professionals regularly provide healthcare to patients. *Mais* involved the services of radiology. Generally, a doctor reads the x-rays or other tests, but the test itself is generally performed by a technical expert that is not a doctor. The *Mais* Court did not distinguish between the

radiologist's bill for reading and interpreting the test results and the cost of the test itself. Here, Plaintiff's doctor ordered lab tests, and sent her to a phlebotomist he provided space for in his office. It is nonsensical to categorize these lab tests as outside of Plaintiff's "medical treatment" or assert that the term specialist as used in the consent form clearly excludes all healthcare professionals that are not doctors.

Plaintiff provided prior express consent to her doctor's office. AFC could legally provide the information to Sonora Quest, a healthcare provider located within its offices. However, it is not clear that Sonora Quest obtained Plaintiff's telephone number from AFC. The Court, therefore, must analyze whether Plaintiff gave her phone number to Sonora Quest directly, thereby providing express consent.

**2. Express Consent to Sonora Quest**

Sonora Quest alleges that Plaintiff provided her cell phone number directly to its IOP on July 2, 2013, and, therefore, it has Plaintiff's prior express consent. (Doc. 123 at 3.) Plaintiff vehemently denies that she provided her cell phone number to the IOP. (Doc. 125 ¶¶ 11, 17-19, 24-27.) It is undisputed that Plaintiff visited other Sonora Quest labs located in other doctors' offices prior to this date and that the Care360 system contained multiple addresses and phone numbers for Plaintiff.

Plaintiff, however, makes a number of conclusory legal statements. First, Plaintiff cites to the *2008 Order* for the proposition that "prior express consent provided to a particular creditor will not entitle that creditor (or third party collector) to call a consumer's wireless number of behalf of other creditors, including on behalf of affiliated entities." (Doc. 128 at 3 (citing *2008 Order* at n.38).) Plaintiff misunderstands the *2008 Order*. It appears Plaintiff reads this citation through the lens of AFC being the creditor, and Sonora Quest and RSI being affiliated entities. Here, the creditor is Sonora Quest and the third-party collector is RSI. An "affiliated entity" is one where there is no contractual relationship between companies, whereas a vendor or contractor is not considered an affiliated entity. *Baird v. Sabre*, 636 Fed.Appx. 715 n.3 (9th Cir. 2016). As detailed in *Mais* and *Baisden*, a phone number provided to a healthcare facility, such as AFC,

includes prior express consent to its contractors, such as Sonora Quest.

She similarly argues that "[t]he FCC's order makes clear that the provision of Plaintiff's number to her medical care provider does not provide Sonora Quest with prior express consent." (Doc. 128 at 2, 5.) Plaintiff mischaracterizes the *2008 Order*. Essentially, Plaintiff argues that the FCC applies only when a creditor gives his or her information to a financial institution. (Doc. 128 at 6.) Although Plaintiff acknowledges the scenario of putting a phone number on a credit application was merely an example by the FCC, she asserts that these were "the types of interactions that the FCC was envisioning when it created the rule." (Doc. 128 at 6.) Plaintiff provides no support for these arguments, and, instead, urges the Court to require Sonora Quest to produce binding case law for the proposition that a creditor includes a medical care provider. (Id.) Plaintiff points to nothing to suggest that *any* circuit limits the application of the FCC to only financial institutions as creditors. Indeed, the *Mais* Court rejected this argument. *Mais*, 768 F.3d at 1122. Plaintiff also presses the Court to leave it to a jury to decide whether the *2008 Order* applies to the current circumstances. (Doc. 128 at 6-7.) However, the clear language of the *2008 Order* and the subsequent rulings and case law make it clear as a matter of law that creditors are not limited to financial institutions and that the *2008 Order* does apply to the current circumstances.

Next, Plaintiff urges the Court to find "that the FCC's 2008 order does not contemplate that the provision of a telephone number in these circumstances as sufficient to evidence the provision of prior express consent to be called at that number." (Doc. 128 at 5.) This argument fails as well. The *2008 Order* expressly stated "that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *2008 Order* at 559. Furthermore, the FCC specifically contemplated such circumstances. Consent is deemed granted "if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." *2008 Order* at 564-65.

Plaintiff asserts that, even if Defendants can prove that Plaintiff provided prior express consent pursuant to 47 U.S.C. § 227(b)(1)(A), Defendants must also prove that the FCC created an exception under § 227(b)(2)(C). (Doc. 127 at 9.) Plaintiff provides no support for such a contention. Section 227(b)(2)(C) is inapplicable to the case at bar. Essentially, Section 227(b)(2)(C) allows the FCC, even if a party was in violation of Section 227(b)(1)(A), to make exemptions for calls to cell phones that are not charged to the called party. The caller must be in violation of (b)(1)(A) before (b)(2)(C) can be triggered. It is not an additional requirement. In the same vein, Plaintiff raises the exemption argument in two other filings, but never develops the argument. (*See* Docs. 116 at 7; 128 at 2.) Plaintiff states that "[b]eyond availing itself of the FCC's 2008 exemption, Defendants are without any basis to argue they possessed 'prior express consent' for any class member." (Doc. 116 at 7.) The *2008 Order*, however, provides no exemptions. The ruling states "that autodialed and prerecorded message calls to wireless numbers that are provided by the called party to a creditor in connection with an existing debt are permissible as calls made with the 'prior express consent' of the called party." *2008 Order* at 559. This language simply restates 47 U.S.C. § 227(b)(1)(A)(iii)—that a caller may not use automated telephone equipment to a cell phone unless the call is made for an emergency purpose or is "made with the prior express consent of the called party." This was an extension of the FCC's *1992 Order* regarding "prior express consent" to cell phones. Plaintiff again raises the issue in response to Sonora Quest's summary judgment motion. (Doc. 128.) She argues that, even if she provided her number to the IOP, Sonora Quest "must still establish that it is entitled to the exemption in the FCC's 2008 order on 'prior express consent.'" (Doc. 128 at 2.) As noted, however, the *2008 Order* does not provide any additional exemptions than those provided by the TCPA. This is a circular argument that takes the Court back to its first statement of the issue: "The only element at issue here is the affirmative defense of express consent." *Supra*.

Turning to the facts, it is undisputed that, on July 2, 2013, Plaintiff handed phlebotomist Lilly Islas a manual requisition form and that the form did not contain

Plaintiff's address or phone number. (Doc. 103-1 at 16.) Islas looked into the Care360 system, but did not find an existing record because she accidentally, but fortuitously for Defendants, entered Plaintiff's wrong birthdate. Because Islas created a new record, rather than accessing Plaintiff's previous record, Islas necessarily had to obtain the information from Plaintiff because it was not on the manual requisition form. Additionally, Islas and another Sonora Quest IOP testified that they always verbally obtain addresses and phone numbers from each patient prior to blood draws. (Docs. 88 ¶¶ 5-6, 10-12; 95 ¶¶ 10, 14-16.) Islas's supervisor also testified that, in the months of June, July, and August 2013, she audited Islas's performance, and each time Islas obtained the proper information from the patient. (Doc. 87 ¶¶ 6-7.) The testimony, backed up by incontrovertible proof in the form of the two Care360 forms printed on the same day (Doc. 103 at 56, 60), shows that Plaintiff must have given Islas her address and phone number.

Plaintiff argues that the existence of information in the Care360 system "eliminate[s] any doubt that Sonora Quest obtained her telephone number from within Care360, not from Plaintiff herself." (Doc. 128 at 4.) However, the fact that the Care360 system contained some form of her information does nothing to refute the evidence that shows that the IOP made a mistake and did not access the Plaintiff's previous information until after creating a new record. Plaintiff further argues that a "reasonable jury could find her recollection credible[.]" (Doc. 128 at 4.) If this were a situation where two parties remembered the event differently, such would be the case. However, in this instance, it is Plaintiff's lack of recollection versus evidence showing that a mistake was made. Plaintiff's denial that she spoke her address or phone number to Islas does not overcome the sheer weight of the evidence. There is yet more evidence.

As acknowledged, Plaintiff's information already existed in the Care360 system, but a closer look at the information in the Care360 system proves that the information could not have automatically populated into the new requisition form. The last Care360 form from FOW was created on October 19, 2011. (Doc. 102-1 at 89.) That form listed

an address on 68th Lane, a completely different address than is on the July 2, 2013 requisition. Plaintiff argues that FOW had her current address because she provided them with the new 7920 address on May 24, 2013. (Doc. 128 at 4.) This argument fails, however, because she did not have any blood work done that day. Pap smears were processed in a different fashion; the FOW IOP was not involved and the Care360 system was not utilized on May 24, 2013. (Doc. 96 ¶ 21.) No reasonable jury could find Plaintiff's recollection credible.

Plaintiff also argues that because both Care360 forms have identical timestamps, "a reasonable jury could find it more credible that the Care360 system updated both records at the same time." (Doc. 128 at 5.) Sonora Quest has produced two different Care360 forms. (Doc. 103 at 56, 60.) The following facts prove that Islas entered an incorrect birthdate for Plaintiff and could not have retrieved information already contained in the Care360 system: (1) Islas could not have obtained Plaintiff's prior cell phone record without entering in her correct birthdate; (2) if Islas had entered the correct birthdate, she would have pulled up Plaintiff's existing record and there would be no form listing the wrong birthdate; (3) if Islas entered the correct birthdate, the second form would not have had a message about the updated birthdate because there would be nothing to update; (4) the forms have two different requisition numbers with the lowest invoice number being the form that contained the incorrect birthdate inferring that it was created first; (5) Plaintiff's new address did not previously exist in the Care360 system; and (6) only the second form is signed by Plaintiff. Plaintiff would have the Court believe that Islas simultaneously produced both records, but does not even attempt to explain why Islas would deliberately enter the wrong birthdate to create the simultaneous forms or have any evidence that such a thing is even possible. No reasonable jury could find that identical timestamps somehow disproves the significant amount of evidence provided by Defendants.

Plaintiff gave her prior express consent to both AFC and Sonora Quest to receive calls on her cell phone by providing them with a cell phone number directly in relation to

appointments at the end of June and beginning of July in 2013. The Court need not reach whether Plaintiff provided her cell phone number to RSI because RSI was acting as a third-party collector on behalf of Sonora Quest. As such, it is as if Sonora Quest placed the phone calls. *See GroupMe* at 3444. Any prior express consent granted to Sonora Quest applies equally to RSI unless RSI obtained the cell phone number from another source, which did not happen here. Prior express consent is a complete defense to a TCPA claim. Plaintiff's claims must be dismissed in their entirety.

**IV. Class Certification**

**A. Legal Standard**

Rule 23 of the Federal Rules of Civil Procedure governs class actions. A member of a class may sue as a representative party if the member satisfies four prerequisites: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). In addition to the prerequisites, the plaintiff must also show that the class falls into one of three categories. Plaintiff seeks certification under Rule 23(b)(3). (Doc. 71 at 4.)

"[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23[.]" *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2412 (2014). "As this Court has repeatedly held, a class representative must be part of the class and "possess the same interest and suffer the same injury" as the class members." *E. Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977).

**B. Analysis**

Plaintiff's claims do not succeed and she, therefore, is not a member of the class. *Id.* The class action fails on that prerequisite alone. But that is not the only reason the class action must fail. It is unlikely that patients go see a doctor at his or her office, has lab work ordered by their doctor, and have their blood taken by an IOP without ever providing their phone number. The fact that some of those phone numbers may be cell phone numbers is immaterial because the patients have then given their prior express consent. The rare patient that could allege facts to survive would be so few as to fall far

short of the numerosity requirement of Fed. R. Civ. P. 23(a)(1). Accordingly,

**IT IS ORDERED:**

1. That Defendants' motions for summary judgment (Docs. 120, 123) are **granted**;
2. That Plaintiff's motion for class certification (Doc. 71) is **denied**; and
3. That the Clerk of Court shall **terminate** this action and enter judgment accordingly.

Dated this 29th day of March, 2017.

Honorable Steven P. Logan
United States District Judge